ZACHARY A. AVALLONE (CA Bar No. 295545)
   Telephone: (202) 551-4479
   Email: avallonez@sec.gov
ANDREW MCFALL
   Telephone: (202) 551-5538
   Email: mcfalla@sec.gov
SETH NADLER
   Telephone: (202) 551-7391
   Email: naders@sec.gov

Securities and Exchange Commission
Division of Enforcement
100 F Street NE
Washington, DC 20549

*Counsel for Plaintiff*
*Securities and Exchange Commission*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 25-cv-1038 |
| *Plaintiff,* | **COMPLAINT JURY DEMAND** |
| v. | |
| RYAN N. COLE, | |
| *Defendant.* | |

SECURITIES AND EXCHANGE COMMISSION V. RYAN N. COLE — COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC") files this Complaint against Defendant Ryan N. Cole ("Cole") and alleges as follows:

## SUMMARY OF THE ACTION

1. While working as a trader for a financial firm (the "Firm"), Defendant Cole perpetrated a manipulative trading scheme known as spoofing. Cole placed fake—or spoof—orders to manipulate the prices of thinly traded options, and then he executed different orders at the resulting manipulated prices. By repeatedly engaging in this fraudulent conduct, Cole obtained approximately $234,000 in ill-gotten gains from this scheme.

2. Cole's spoofing scheme worked like this: he first placed orders for options that were thinly traded and had a large spread between the National Best Bid and the National Best Offer. Cole's spoof orders were visible to the market, were priced either significantly lower than the current best offer or significantly higher than the current best bid. He sometimes placed spoof orders across neighboring options series referencing the same underlying security. By narrowing the spread between the National Best Bid and Offer across options series, Cole attracted the attention of other market participants to these thinly traded options. Cole's spoof orders, however, were non-bona fide orders that he did not intend to execute—instead, they were designed to induce other market participants to trade these securities at manipulated prices, and Cole cancelled most of his spoof orders relatively quickly.

3. After these spoof orders shifted the market by narrowing the National Best Bid and Offer spread across neighboring option series, Cole placed coordinated immediate-or-cancel orders on the opposite side of the market within the newly established price range across options series, usually on a different exchange, some of which, due to the market attention drawn by his spoof orders, were executed. To facilitate desired executions across the neighboring options series in which he had placed spoof orders, Cole used the complex order book to place multi-leg immediate-

or-cancel orders. After his immediate-or-cancel orders were executed, Cole then cancelled his spoof orders, which had the effect of returning the National Best Bid and Offer spread to true market levels.

4. To close out his position, Cole then repeated these same steps on the opposite side of the market—first using a publicly viewable spoof order to set a new National Best Bid or National Best Offer and then submitting immediate-or-cancel orders to lock in his ill-gotten gains.

5. Through this scheme, Cole used spoof option orders—option orders that he never had any intention of executing—to artificially deflate or inflate the price of thinly traded options. He then profited by buying and selling those same options at artificial prices. This practice has long been recognized as an illegal, fraudulent scheme and a form of market manipulation.

6. Cole knew or was reckless in not knowing that this type of trading was illegal. As part of his job as a trader, he attended annual compliance trainings led by the Firm's Chief Compliance Officer, including training on improper strategies such as spoofing.

7. Cole also took steps to conceal his spoofing from the Firm. When Firm senior management, including the Chief Compliance Officer, asked Cole about his daily trading activity, Cole provided false and misleading responses.

8. In early February 2022, the Firm's Chief Compliance Officer asked Cole a series of questions about his trading that appeared to reflect spoofing activity and requested that Cole provide responses "with very specific detail." Cole's answers were short, non-responsive, and failed to address the indicia of spoofing that the Chief Compliance Officer raised.

9. Dissatisfied with Cole's responses, the Firm terminated Cole's employment.

10. By perpetrating the spoofing scheme and as alleged further in this Complaint, Cole violated, and unless enjoined will continue to violate, Sections

17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a), (c)].

## JURISDICTION AND VENUE

11. The SEC brings this action, and this Court has subject matter jurisdiction over this action, pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Cole, directly or indirectly, made use of the mails, or the means and instrumentalities of interstate commerce, or the facilities of national securities exchanges, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

12. Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because the Defendant can be found within the Eastern District of California. He currently splits his time between Nevada and a residence in Folsom, California.

## DEFENDANT

13. **Ryan N. Cole**, age 39, is a former day trader and has never held any securities licenses. Cole worked at the Firm from May 2018 through February 2022.

## TERMS USED IN THIS COMPLAINT

14. *Options* are a contract that gives the owner the right, but not the obligation, to buy or sell a specific quantity of an asset at a specific price ("strike price") on or before a specific date ("expiration"). Options for securities are frequently sold as one contract representing 100 shares of a stock.

15. *Option series* refers to the same type of options (e.g., a put or a call) for an underlying security with the same strike price and expiration.

16. *Spoofing* refers to a type of market manipulation scheme where a trader enters non-bona fide orders to create a false appearance of new or increased

trading interest in a security. Spoofers induce others to place orders priced at or better than the spoofer's non-bona fide orders. Spoofing creates artificial market conditions that benefit the spoofer's interests while harming other market participants.

17. *National Best Bid* is the highest reported price a buyer is willing to pay to buy a security.

18. *National Best Offer* is the lowest reported price that a seller is willing to accept to sell a security.

19. *NBBO.* The spread between the National Best Bid and National Best Offer is referred to as the "NBBO." The NBBO is publicly reported to the market and represents the tightest bid-ask spread for a particular security.

20. *Thinly traded securities* are securities that have low trading volume. As compared to more actively traded securities with greater trading volume, thinly traded securities often have fewer interested buyers and sellers and larger NBBO spreads. Thus, a small number of orders or trades can substantially impact the market prices of thinly traded securities, rendering them more susceptible to manipulation than securities that are more actively traded.

21. *Limit orders* can only be executed if the market price reaches the limit price. A buy limit order can only be executed at the limit price or lower, and a sell limit order can only be executed at the limit price or higher. While limit orders do not guarantee execution, they help ensure that an investor does not pay more than a pre-determined price.

22. *Day-limit orders* are limit orders to buy or sell a security at a specific price or better and which are automatically canceled if they remain unexecuted by the end of the trading day. While day-limit orders are open, they are publicly visible and can affect the NBBO.

23. *Immediate-or-cancel orders* are a type of limit order that must be executed immediately upon their placement. Any portion of an immediate-or-cancel

order that cannot be filled immediately will be cancelled. Given the nature of an immediate-or-cancel order, it does not affect the NBBO and is not publicly visible unless and until it is executed.

24. *Multi-leg orders* are a type of complex order for two or more different options series ("legs").

25. *Complex Order Book* enables market participants to place multi-leg options orders.

## FACTS

### I. The Firm Hired Cole and Warned Him Not to Spoof.

26. In May 2018, the Firm hired Cole to trade an account funded by the Firm. Cole was paid an annual salary and was eligible for a performance-based bonus.

27. Starting in January 2019, and annually thereafter, Cole received training from the Firm's Chief Compliance Officer on disruptive trading practices and improper order behavior. The Chief Compliance Officer explained that Cole and other employees were prohibited from spoofing, which the training materials described as entering orders without any intention of executing those orders for the purpose of driving the market price of a security up or down.

28. The Firm also explained to Cole that it monitored its traders' activity for manipulative order behavior by reviewing, among other things, a trader's cancellation ratio, pattern and practice of order placement, and a trader's overall volume as a percentage of the market.

29. The Firm told Cole that engaging in improper order behavior could result in termination of his employment, legal action, and an industry bar.

### II. Cole Engaged in Manipulative Trading.

30. Despite the Firm's training, Cole engaged in spoofing on an almost daily basis from September 2020 through February 2022. Using accounts and assets belonging to the Firm, Cole entered options orders that he did not intend to execute

which allowed him to buy options at artificially low prices and sell at artificially high prices.

31. Cole generally spoofed thinly traded options with a large NBBO spread—a large difference between the National Best Bid and the National Best Offer. He first placed visible, day-limit orders on one side of the market, at a price near the middle of the NBBO. Cole entered similar orders simultaneously across different options series for the same stock. These limit orders shifted and narrowed the NBBOs across options series, creating a false appearance of new or increased trading interest in those options.

32. Cole then placed a flurry of immediate-or-cancel orders on the opposite side of the market within the new, narrower NBBO spreads. Unlike his day-limit orders, Cole's immediate-or-cancel orders did not impact the National Best Bid or the National Best Offer and those orders were not visible to the market unless and until they were executed. Cole repeatedly submitted immediate-or-cancel orders across related options series, hoping to buy at artificially lower prices or sell at artificially higher prices.

33. Once Cole's immediate-or-cancel orders were no longer being executed, he cancelled his non-bona fide day-limit orders. This usually triggered an immediate decrease in the National Best Bid (or increase in the National Best Offer) and a return to the true market NBBO.

34. Cole then repeated the same spoofing scheme on the other side of the market to lock in his profits.

35. Here is an example of how Cole's scheme worked. On February 1, 2022, Cole spoofed call options for the common stock of a company with a strike price of $430 and an expiration date of March 4, 2022. Before Cole's manipulative trading, the National Best Bid for these options was $0.50 and the National Best Offer was $5.30. These options were thinly-traded, far out-of-the-money (the underlying

1  security was trading around $343 per share) and long-dated (set to expire in more
2  than a month).

3      36.    At 9:40:12 a.m., Cole placed a day-limit order to sell 11 contracts for
4  these call options at a price of $1.80, which was posted on a national exchange that
5  Cole selected. This order was visible to the market, and it generated a new National
6  Best Offer of $1.80—down from $5.30 before Cole's spoof order.

7      37.    Once the new NBBO range was set and reported, Cole then submitted
8  immediate-or-cancel orders to buy one call option contract on an exchange that was
9  different from the exchanges he had selected for his day-limit sell order.

10     38.    At 9:42:11 a.m., one of Cole's immediate-or-cancel buy orders executed
11 at the price of $1.40. He then placed immediate-or-cancel orders to buy 20 contracts
12 of the same options. One of those 20-contract orders was executed at the price of
13 $1.50. Cole submitted more immediate-or-cancel buy orders for 20 contracts each,
14 but no more orders were executed.

15     39.    At 9:50:41 a.m., Cole cancelled his spoof day-limit sell order, and
16 within seconds the National Best Offer rose from $1.80 to $4.80.

17     40.    At this point, Cole had spent $3,140 to purchase 21 contracts for these
18 options.

19     41.    To lock in his profits from this manipulation, Cole repeated the same
20 spoofing scheme on the other side of the market. At 9:51:59 a.m., Cole placed a day-
21 limit order to buy 11 of the same call option contracts at a price of $1.60, which was
22 posted on a national exchange that Cole selected. This order was visible to the
23 market and increased the National Best Bid from $0.10 to $1.60.

24     42.    At 9:53:13 a.m., Cole began to submit immediate-or-cancel orders to
25 sell one call option contract on an exchange different from the one selected for his
26 day-limit buy order. As soon as an order executed at a price of $2.21, Cole submitted
27 multiple immediate-or-cancel orders, each offering to sell 20 contracts. One order for
28 20 contracts was ultimately executed at a price of $2.12.

43. After entering four more immediate-or-cancel sell orders for 20 contracts each, without receiving an execution, Cole canceled his spoof day-limit buy order at 9:55:01 a.m. Approximately two seconds later, the National Best Bid for those options fell from $1.60 to $0.50.

44. In summary, between around 9:40 and 9:55 a.m. on February 1, 2022, Cole bought 21 contracts for these options at $3,140 and then sold the 21 contracts for $4,461—locking in an illicit profit of $1,321 in around 15 minutes. Note that Cole's profit for this window was actually higher because while Cole was engaging in spoofing on the March 4, 2022 $430 call option series, he was placing related spoofing orders on the $435 and $440 call options series for the same underlying stock, manipulating those prices, and reaping additional illicit profits of around $4,600.

### III. Cole Tried to Conceal His Scheme and Was Terminated.

45. The Firm required Cole to submit daily reports of his trading activity via firm-wide emails. In those reports, Cole identified his successful trades and described strategies he was purportedly executing. However, Cole did not disclose his spoofing strategy or any part of that strategy, including (i) the placement of opposite-side trades on different exchanges, (ii) the extremely high cancellation rates of his visible day-limit orders, (iii) the low execution rates of his visible day-limit orders, (iv) the impact on the NBBO from placing and canceling visible day-limit orders, and (v) the single-contract, immediate-or-cancel orders followed by higher contract-volume orders (as in the example above, where single-contract orders were followed by 20-contract orders).

46. On at least two separate occasions, members of the Firm's senior management, including the Firm's Chief Compliance Officer, questioned Cole directly about his "methodology" and the trading "strategies" he was employing. In response, Cole supplied false and misleading statements.

47. On November 8, 2021, for example, the Firm's Chief Compliance Officer told Cole that the Firm sought "a better understanding of the strategy," and asked for "a description of the selection process, specific strategy, along with the intended outcome" for each of Cole's "current positions." The Chief Compliance Officer explained that this information was being requested "to confirm compliance." Cole submitted a list of strategies he was purportedly using, including trading based on such themes as COVID-19 and Bitcoin, trading based on information obtained from news services, and price-based "momentum" trading. However, nowhere in his response did Cole disclose his spoofing strategy nor any key components of that strategy.

48. On February 2, 2022, the Chief Compliance Officer reviewed Cole's trading activity and told him that his "order placement, cancellations and executions [we]re extremely concerning" and that Cole's approach was "not consistent" with the strategies that Cole had earlier described to the Chief Compliance Officer.

49. The Chief Compliance Officer then asked Cole to provide written answers to a series of trading questions "with very specific detail."

50. The Chief Compliance Officer's questions reflected concerns of potential spoofing activity, including (i) whether or not Cole believed his trading was "impacting the market," (ii) why Cole was "loading up on a term structure and canceling," and (iii) whether Cole's orders were "entered with the intent to be executed," given that his "execution ratio" for certain orders reflected "little to no likelihood" of execution.

51. Despite the Chief Compliance Officer's stated concerns and requests for very specific detail, Cole's answers were short and non-responsive. For example, in response to a question on the market impact of his orders, Cole responded that "all activity in the market has some way of impacting price."

52. Dissatisfied with Cole's responses, the Firm's Chief Compliance Officer recommended that the Firm terminate Cole.

53. A week later, on February 9, 2022, the Firm terminated Cole's employment.

## FIRST CLAIM FOR RELIEF

## Fraud in Violation of Sections 17(a)(1) and (3) of the Securities Act

54. The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 53, inclusive, as if they were fully set forth herein.

55. As set forth above, Defendant Cole engaged in a scheme to fraudulently manipulate the prices of thinly traded options by placing spoof orders that he had no intention of executing. Cole then profited from his scheme by executing orders at the resulting manipulated prices. He knew, or was reckless or negligent in not knowing, that this type of trading was illegal because, among other things, he attended annual compliance trainings that warned him against spoofing. Cole acted with *scienter* and took steps to conceal his spoofing from the Firm.

56. By virtue of the foregoing, Cole, directly or indirectly, in the offer or sale of securities, and by the use of the means of instruments of transportation or communication in interstate commerce or the mails:

    a) Knowingly or recklessly employed one or more devices, schemes or artifices to defraud; and

    b) Knowingly, recklessly, or negligently engaged in one or more transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

57. By virtue of the foregoing, Cole violated and, unless restrained and enjoined, will again violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF

## Fraud in Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder

58. The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 53, inclusive, as if they were fully set forth herein.

59. As set forth above, Defendant Cole engaged in a scheme to fraudulently manipulate the prices of thinly traded options by placing spoof orders that he had no intention of executing. Cole then profited from his scheme by executing orders at the resulting manipulated prices. He knew, or was reckless in not knowing, that this type of trading was illegal because, among other things, he attended annual compliance trainings that warned him against spoofing. Cole acted with *scienter* and took steps to conceal his spoofing from the Firm.

60. By virtue of the foregoing, Cole directly or indirectly, in connection with the purchase or sale of a security, by use of the means or instruments of interstate commerce, or of the mails, or the facilities of a national securities exchange, knowingly or recklessly:

   a) Employed one or more devices, schemes, or artifices to defraud; and
   b) Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

61. By virtue of the foregoing, Cole violated and, unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §§ 240.10b-5(a), (c)] thereunder.

## THIRD CLAIM FOR RELIEF

## Violation of Section 9(a)(2) of the Exchange Act

62. The SEC realleges and incorporates by reference each and every allegation in paragraphs 1 through 53, inclusive, as if they were fully set forth herein.

63. As set forth above, Defendant Cole engaged in a scheme to fraudulently manipulate the prices of thinly traded options by placing spoof orders that he had no intention of executing. Cole then profited from his scheme by executing orders at the resulting manipulated prices. He knew, or was reckless in now knowing, that this type of trading was illegal because, among other things, he attended annual compliance trainings that warned him against spoofing. Cole acted with *scienter* and took steps to conceal his spoofing from the Firm.

64. By virtue of the foregoing, Cole, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

65. By reason of the foregoing, Cole violated and, unless enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

## PRAYER FOR RELIEF

**WHEREFORE**, the SEC respectfully requests that this Court enter a Final Judgment that:

a) Finds that Cole violated federal securities laws as alleged in this Complaint;

b) Orders Cole to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received, directly or indirectly, as a result of the conduct alleged in this Complaint;

c) Orders Cole to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

d) Permanently restrains and enjoins Cole from violating, directly or indirectly, Section 9(a)(2) of the Securities Exchange Act of 1934

    (the "Exchange Act") [15 U.S.C. § 78i(a)(2)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security to effect a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others;

e) Permanently restrains and enjoins Cole from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) promulgated thereunder [17 C.F.R. § 240.10b-5(a) and (c)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security; to employ any device, scheme, or artifice to defraud, or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

f) Permanently restrains and enjoins Cole from violating Sections 17(a)(1) and (3) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)(1) and (3)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly; to employ any device, scheme, or artifice to defraud or to engage in any transaction, practice, or course of

business which operates or would operate as a fraud or deceit upon the purchaser;

g) Enjoins Cole, for a period of five years, from, directly or indirectly, opening, maintaining or trading in any brokerage account(s) in his name, the names of any immediate family members, the names of any company over which he has any control or the names of any third party individual(s), without providing the relevant broker-dealer(s) a copy of the complaint and final judgment entered against him in this action, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(5)]; and

h) Grants such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried before a jury.

DATE: August 11, 2025

*/s/ Zachary A. Avallone*
ZACHARY A. AVALLONE
   (CA Bar No. 295545)
   Telephone: (202) 551-4479
   Email: avallonez@sec.gov
ANDREW MCFALL
   Telephone: (202) 551-5538
   Email: mcfalla@sec.gov
SETH NADLER
   Telephone: (202) 551-7391
   Email: naders@sec.gov

Securities and Exchange Commission
Division of Enforcement
100 F Street NE
Washington, DC 20549

*Counsel for Plaintiff*
*Securities and Exchange Commission*